# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 14-CV-663 (JFB) (AKT)

———————————

## HOMEOPET LLC,

Plaintiff,

VERSUS

## SPEED LABORATORY, INC.,

Defendant.

———————————

**MEMORANDUM AND ORDER**
June 11, 2014

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff HomeoPet LLC ("plaintiff" or "HomeoPet") produces and sells homeopathic remedies for common conditions suffered by animals. In this action, plaintiff claims that defendant Speed Laboratory, Inc. ("defendant" or "Speed") failed to meet its contractual obligation to perform certain tests on plaintiff's products, which led to the denial of plaintiff's application for a license to sell its products over the counter in Australia. As a result of these events, plaintiff alleges the following causes of action: (1) breach of contract; (2) negligence; (3) willful misconduct; and (4) gross negligence.

Plaintiff initially commenced this action against defendant on December 17, 2013, in the Supreme Court of the State of New York, County of Suffolk. After defendant was served with the complaint, defendant removed the case to this Court on January 30, 2014.

Presently before the Court is defendant's motion to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), or, in the alternative, to transfer this action to the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, the Court grants the motion to dismiss the negligence, willful misconduct, and gross negligence claims for lack of personal jurisdiction, and grants the motion to transfer this case to the Northern District of Georgia. First, the Court grants in part and denies in part defendant's motion to dismiss for lack of personal jurisdiction. Specifically, plaintiff's complaint adequately alleges personal jurisdiction over defendant for the breach of contract claim, because the complaint alleges that the parties conducted preliminary negotiations leading to the execution of the contract at issue in

1

plaintiff's headquarters in Westhampton, New York. At this juncture, the Court cannot consider defendant's contrary evidence suggesting that the parties never negotiated the contract in New York. However, even construing the complaint in the light most favorable to plaintiff, the Court concludes that plaintiff has failed to make a *prima facie* showing of personal jurisdiction over defendant for its remaining tort claims. With respect to these claims, plaintiff relies on New York's long-arm statute concerning torts committed outside New York that cause injury in New York. *See* N.Y. C.P.L.R. § 302(a)(3). Decisions applying this statute focus on the location of the "original event" causing injury in order to determine the situs of the injury. Here, even construing the complaint in the light most favorable to plaintiff, the Court determines that New York was not the situs of the injury because all relevant acts giving rise to the alleged torts occurred outside New York. Indeed, the only connection these torts bear to New York is plaintiff's location in New York, which is insufficient as a matter of law to warrant the exercise of long-arm jurisdiction. Accordingly, the Court grants the motion to dismiss the negligence, willful misconduct, and gross negligence claims for lack of personal jurisdiction. Second, with respect to the surviving breach of contract claim, the Court concludes that venue is proper because defendant removed this action from the Supreme Court of the State of New York in Suffolk County, which is located within this judicial district. Third, the Court grants defendant's motion to transfer this action to the Northern District of Georgia. Currently pending in the Northern District of Georgia is a substantially similar action brought by Speed against HomeoPet. Although that action was filed six days after the instant case, the Court determines that the balance of convenience factors warrants transfer to

the Northern District of Georgia. In particular, because the Court is dismissing plaintiff's tort claims for lack of personal jurisdiction, plaintiff would have to raise those claims as counterclaims in the pending Georgia Action while maintaining its breach of contract claim in this Court. The federal transfer statute, 28 U.S.C. § 1404, empowers courts to prevent precisely that sort of wasteful, piecemeal litigation. Accordingly, the Court, in its discretion, grants defendant's motion to transfer this action to the Northern District of Georgia.

I. BACKGROUND

A. Facts

The following facts are taken from the complaint. These are not findings of fact by the Court. Instead, the Court assumes these facts to be true for purposes of deciding the present motions and construes them in the light most favorable to plaintiff, the non-moving party. The Court discusses additional facts in connection with the specific issues raised.

HomeoPet is a Delaware limited liability company with headquarters in Westhampton, New York. (*Id.* ¶ 1.) The company produces and sells homeopathic remedies for common conditions suffered by animals in the United States, the United Kingdom, and Ireland. (Compl. ¶¶ 1, 14–15.)

Speed is a Georgia corporation headquartered in Buford, Georgia. (*Id.* ¶ 1.) Speed provides comprehensive analytical laboratory services to pharmaceutical, biotech, homeopathic, medical device, environmental, and specialty chemical companies. (*Id.* ¶ 3.) The company also claims expertise in advising companies on how to comply with international good manufacturing practices, international good

laboratory practices, and regulations promulgated by the U.S. Food and Drug Administration ("FDA") and by foreign regulatory agencies. (*Id.* ¶ 4.)

The instant case concerns HomeoPet's unsuccessful application for an unrestricted license to sell its homeopathic pet products over the counter in Australia. Specifically, in 2005, HomeoPet decided to expand its business by applying for a General Sales License in Australia, which would have allowed HomeoPet to market and sell its products over the counter in Australia without restriction. (*Id.* ¶ 16.) HomeoPet filed its application for a General Sales License with the Australian Pesticides and Veterinarian Medicines Authority ("APVMA") on September 15, 2005. (*Id.* ¶ 26.) Shortly thereafter, the APVMA issued HomeoPet a restricted license to sell its products to veterinarians in Australia. (*Id.* ¶ 27.) A restricted license allows an applicant for a General Sales License to sell its products to veterinarians in Australia, and the veterinarians who use the applicant's products are required to maintain records concerning their use in treatment. (*Id.* ¶¶ 19–20.) The applicant with a restricted license must collect these records over a period of at least five years to prove to the APVMA that the products are safe. (*Id.*) Accordingly, in late 2010, HomeoPet submitted a dossier of data collected by veterinarians over the previous five years, along with other required documentation and records, to the APVMA in support of its application for a General Sales License. (*Id.* ¶ 29.)

The APVMA sent HomeoPet a letter on November 24, 2010, indicating that HomeoPet's application was deficient. (*Id.* ¶ 30.) In particular, the APVMA noted that HomeoPet had failed to include evidence that its products complied with internationally accepted good manufacturing practices. (*Id.*) Accordingly, the APVMA

requested that HomeoPet provide the following additional evidence by March 30, 2012: (1) an accelerated stability test conducted over six months, which would determine the products' shelf lives; and (2) test results confirming the certificates of analysis prepared by HomeoPet's suppliers. (*Id.* ¶¶ 30–31.)

In order to comply with the APVMA's request, HomeoPet sought the services of Speed in the spring of 2011. (*Id.* ¶ 32.) On April 25, 2011, HomeoPet and Speed executed an agreement, according to which HomeoPet would pay Speed $50,000, and Speed would perform an accelerated stability test on nine of HomeoPet's products. (*Id.* ¶¶ 33–34.) After the agreement was executed, Speed agreed to test four additional HomeoPet products. (*Id.* ¶ 33.) Pursuant to the agreement, HomeoPet paid Speed in full and provided samples for Speed to test. (*Id.* ¶¶ 35–36.) HomeoPet also gave Speed specific instructions on how to perform the tests in conformity with international good manufacturing practices, which require an accelerated stability test to test three separate sample batches for each product. (*Id.* ¶ 37.)

Speed performed the stability test and reported its results to HomeoPet on March 27, 2012—three days before HomeoPet's deadline to submit the report to the APVMA. (*Id.* ¶ 38.) The results report shows that Speed tested only one sample batch for each product tested—in violation of international good manufacturing practices—and that Speed tested only eight of HomeoPet's products. (*Id.* ¶¶ 39–40.) Nonetheless, HomeoPet filed the test report with the APVMA on March 29, 2012, in order to meet the March 30, 2012 deadline. (*Id.* ¶ 41.) When HomeoPet alerted Speed to the problems in its testing, Speed's President, Alex Getahoun ("Getahoun"), sent HomeoPet an e-mail on May 17, 2012,

in which he admitted that the testing had not been performed correctly and had not included all of HomeoPet's products. (*Id.* ¶ 43.) Getahoun further informed HomeoPet that Speed had fired the laboratory technician who had performed the testing, and that he would be personally involved in ensuring that Speed addressed the issue without additional mistakes. (*Id.*) Speed also promised to retest all thirteen of HomeoPet's products, in addition to several other products unrelated to HomeoPet's application with the APVMA, at no additional cost to HomeoPet. (*Id.* ¶ 46.)

Unsurprisingly, on September 11, 2012, the APVMA sent a letter to HomeoPet indicating that the accelerated stability testing was deficient because it had not been performed in accordance with good manufacturing practices. (*Id.* ¶ 44.) However, the APVMA gave HomeoPet an opportunity to cure this deficiency by submitting a new stability test report, along with new certificates of analysis for HomeoPet's raw materials supplies and a confirmation of those certificates based on testing by an independent laboratory. (*Id.* ¶ 45.) On November 20, 2012, the APVMA extended HomeoPet's deadline to file the requisite documents and materials to December 6, 2013. (*Id.* ¶ 49.)

Once HomeoPet was informed of the new deadline, it reached out to Speed to conduct a second stability test. (*Id.* ¶ 52.) Sometime in the second half of 2012, Getahoun visited HomeoPet's facility in Westhampton, New York, to instruct HomeoPet employees on compliance with international good manufacturing practices standards. (*Id.* ¶ 9.) While Getahoun was in New York, HomeoPet and Speed discussed terms for an agreement to conduct the second stability test. (*Id.* ¶ 10.) Speed sent HomeoPet a proposal on November 29, 2012, in which Speed offered to provide a variety of services to ensure that HomeoPet's standard operating procedures, production protocols, methods of validation, quality control, and quality assurance were in compliance with regulatory standards. (*Id.* ¶ 53.) Speed offered to provide these services for $598,240. (*Id.* ¶ 54.) HomeoPet rejected the proposal, but the two sides continued to negotiate. (*Id.* ¶ 55.) Finally, HomeoPet and Speed reached an agreement in December 2012 (the "2012 Agreement"). (*Id.* ¶ 56.) Speed agreed, *inter alia*, to test and confirm the certificates of analysis of HomeoPet's products; to prepare a premix of HomeoPet's products, and to write new standard operating procedures for preparing the premix; to compound from the premix a finished product, and to write new standard operating procedures for the manufacturer to follow in producing the final product; to conduct both a six-month accelerated stability test and a twenty-four month stability test for all of HomeoPet's products, including the thirteen products that were the subject of HomeoPet's AVPMA application; and to perform other necessary services to bring HomeoPet into compliance with the APVMA's standards. (*Id.*) On February 5, 2013, HomeoPet agreed to pay Speed a total of $144,000 in thirty-six monthly installments of $4,000. (*Id.* ¶ 60.)

In January 2013, HomeoPet delivered raw materials to Speed for testing. (*Id.* ¶ 63.) In April 2013, Speed shipped HomeoPet's raw materials and a manufacturing dossier to HomeoPet's manufacturer, who was to produce the samples needed for the second stability test. (*Id.* ¶ 67.) However, on April 17, 2013, the manufacturer informed HomeoPet that Speed had mishandled the raw materials. (*Id.* ¶ 68.) As a result, the raw materials were placed in quarantine pursuant to FDA regulations. (*Id.* ¶ 69.) HomeoPet's manufacturer also informed HomeoPet that Speed had failed to deliver test results confirming the certificates of analysis, and

that Speed's standard operating procedures and manufacturing protocols were deficient. (*Id.* ¶ 70.) In HomeoPet's conversations with Speed, Speed admitted that it had not performed testing to confirm the certificates of analysis. (*Id.* ¶ 73.)

Because HomeoPet was obligated to submit the results of the six-month accelerated stability test to the APVMA by December 6, 2013, HomeoPet had to begin those tests by May 6, 2013. (*Id.* ¶ 51.) HomeoPet alleges that Speed exploited HomeoPet's tight deadline by demanding that HomeoPet sign the November 29, 2012 proposal. (*Id.* ¶ 80–81.) Speed also demanded that HomeoPet send $20,000 to Speed in order to perform the necessary testing to confirm the certifications of analysis. (*Id.* ¶ 82.) HomeoPet rejected these demands. (*Id.* ¶ 83.)

Instead, on April 21, 2013, HomeoPet informed Speed of its intention to use raw materials held in Ireland to produce samples for the second stability test. (*Id.* ¶ 84.) HomeoPet also told Speed that the samples would be manufactured according to HomeoPet's existing standard operating procedures, manufacturing protocols, and methods of validation—and not the new procedures that Speed had developed. (*Id.* ¶ 86.) HomeoPet also arranged for another laboratory to perform the tests to confirm the certifications of analysis. (*Id.* ¶ 84.) HomeoPet told Speed that it would deliver the new samples to Speed on April 30, 2013, and Speed agreed to begin testing as soon as it received the samples. (*Id.* ¶¶ 87–88.)

HomeoPet shipped the samples from Ireland to Speed on April 29, 2013. (*Id.* ¶ 90.) The samples were delivered to Speed the next morning. (*Id.*) While the samples were in transit, Speed attempted to renegotiate the terms of the 2012 Agreement. (*Id.* ¶ 91.) Then, on May 6,

2013, Speed told HomeoPet that it had not yet commenced the second stability test. (*Id.* ¶ 95.) Speed would not perform the test unless HomeoPet paid Speed $86,400 and signed Speed's most recent proposal that would have required HomeoPet to continue making $4,000 monthly payments. (*Id.* ¶ 95.) HomeoPet refused. (*Id.* ¶ 98.)

HomeoPet requested an extension of time to file the results of the second stability test with the APVMA, but the APVMA denied the request. (*Id.* ¶ 99.) Consequently, the APVMA rejected HomeoPet's application for a General Sales License. (*Id.* ¶ 100.)

### B. The Georgia Action

Speed commenced an action against HomeoPet in a Georgia Superior Court on December 23, 2013—less than one week after plaintiff commenced this action (the "Georgia Action"). HomeoPet removed that action to the United States District Court for the Northern District of Georgia on February 4, 2014. (*See* Notice of Removal, *Speed Lab., Inc. v. HomeoPet, LLC*, No. 14-CV-324-CC (N.D. Ga. Feb. 4, 2014). [1] ) On March 14, 2014, HomeoPet filed a motion to transfer the Georgia Action to this Court. (*See* Mot., *Speed Lab., Inc. v. HomeoPet, LLC*, No. 14-CV-324-CC (N.D. Ga. Mar. 14, 2014).) To date, that motion remains pending.

---

[1] The Court takes judicial notice of the Georgia Action. *See, e.g.*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."); *Vaughn v. Consumer Home Mortg. Co., Inc.*, 470 F. Supp. 2d 248, 256 n.8 (E.D.N.Y. 2007) ("It is . . . well established that courts may take judicial notice of court records"), *aff'd*, 297 F. App'x 23 (2d Cir. 2008).

## B. Procedural History

Plaintiff commenced this action in the Supreme Court of the State of New York, County of Suffolk, on December 17, 2013. Defendant removed the action to this Court on January 30, 2014.

Defendant filed the instant motion on April 4, 2014. Plaintiff filed its opposition to the motion on April 28, 2014, and defendant filed its reply on May 12, 2014. The Court heard oral argument on the motion on June 10, 2014. The Court has fully considered the submissions of the parties.

## II. MOTION TO DISMISS

### A. Personal Jurisdiction

#### 1. Legal Standard

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003); *see, e.g.*, *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). However, before discovery and on a motion to dismiss that challenges the sufficiency of the factual allegations, the plaintiff need only make a *prima facie* showing of jurisdiction through its own affidavits and supporting materials to defeat the motion. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013); *see also Welinsky v. Resort of the World D.N.V.*, 839 F.2d 928, 930 (2d Cir. 1988) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). In considering a Rule 12(b)(2) motion, the pleadings and affidavits are to be construed in the light most favorable to plaintiff, the non-moving party, and all doubts are to be resolved in plaintiff's favor. *DiStefano v.*

*Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). However, the Court will neither "draw argumentative inferences in the plaintiff's favor," nor "accept as true a legal conclusion couched as a factual allegation." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) (internal quotation marks and citations omitted).

Resolving issues of personal jurisdiction requires a "'two-part analysis.'" *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). First, a district court must determine whether there is personal jurisdiction over the defendant under the laws of the forum state, here, New York. *Id.*; *see, e.g.*, *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) ("In diversity cases, the issue of personal jurisdiction is governed by the law of the forum state . . . ."); *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997) (same). Under New York law, there are two bases for personal jurisdiction over an out-of-state defendant: (1) general jurisdiction pursuant to N.Y. C.P.L.R. § 301, and (2) long-arm jurisdiction pursuant to N.Y. C.P.L.R. § 302 ("Section 302"). Second, if the court concludes that the exercise of jurisdiction is proper under the law of the forum state, "the court then must decide whether such exercise comports with the requisites of due process." *Bensusian Rest.*, 126 F.3d at 27.

#### 2. Application

The issue in the instant case is whether this Court has long-arm jurisdiction over defendant, which is a non-domiciliary of

New York.[2] For the reasons that follow, the Court concludes that plaintiff has made a *prima facie* showing of specific personal jurisdiction over defendant with respect to the breach of contract claim, but not with respect to the remaining tort claims. Accordingly, with the exception of the breach of contract claim, the Court dismisses all other claims without prejudice.

a. Section 302

Section 302(a) sets forth four bases for specific jurisdiction over an out-of-state defendant.[3] As an initial matter, Section 302(a)(2) does not apply here because plaintiff does not claim that any of the allegedly tortious acts occurred in New York. Section 302(a)(4) is also inapplicable, as plaintiff does not allege that defendant owns, uses, or possesses any real property in New York.[4] Thus, plaintiff must establish long-arm jurisdiction over defendant under either Section 302(a)(1) or Section 302(a)(3).

Where a plaintiff relies on Section 302(a)(1) or Section (a)(3) and alleges more than one cause of action, the Court must consider whether it has personal jurisdiction for each separate claim. *Huang v. iTV Media, Inc.*, --- F. Supp. 2d ----, No. 13-CV-3439 (JFB) (WDW), 2014 WL 1377500, at *4 n.3 (E.D.N.Y. Apr. 8, 2014). This is because both Sections 302(a)(1) and 302(a)(3) have an "arising under"

---

[2] Plaintiff does not argue that this Court has general jurisdiction over defendant, and the complaint does not allege that defendant engaged in the sort of "continuous and systematic course of doing business" in New York that would support general jurisdiction. *Cf. Universal Trading & Inv. Co., Inc. v. Credit Suisse (Guernsey) Ltd.*, --- F. App'x ----, No. 13-1639-CV, 2014 WL 1099222, at *2 (2d Cir. Mar. 21, 2014) (summary order) ("To establish general jurisdiction, a plaintiff must set forth facts of a 'continuous and systematic course of doing business' in New York that 'warrant[s] a finding of [defendants'] presence' in the state." (quoting *Laufer v. Ostrow*, 55 N.Y.2d 305, 309–10 (1982) (alterations in original))).

[3] Section 302(a) provides:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).

[4] Plaintiff does not argue that either Section 302(a)(2) or Section 302(a)(4) applies in the instant case.

component, requiring that the claims asserted arise from the defendant's activities. *See id.* In the instant case, plaintiff maintains that Section 302(a)(1) supports the exercise of personal jurisdiction over defendant for the breach of contract claim, and that Section 302(a)(3) supports the exercise of personal jurisdiction over defendant for the tort claims. The Court considers each argument, in turn.

i. Breach of Contract Claim

Section 302(a)(1) provides for personal jurisdiction "only over a defendant who has 'purposefully availed himself of the privilege of conducting activities within New York and thereby invoke[ed] the benefits and protections of its laws.'" *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000) (quoting *Parke-Bernet Galleries v. Franklyn*, 26 N.Y.3d 13, 17 (1970)) (alteration in original). To establish personal jurisdiction under this statute, "two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citing *McGowan v. Smith*, 52 N.Y.2d 268, 273 (1981)). Among the factors that bear on whether an out-of-state defendant transacts business in New York are the following: (1) whether the defendant has an on-going contractual relationship with a New York entity; (2) whether the contract was negotiated or executed in New York and whether, after executing a contract with the New York entity, the defendant visited New York to conduct meetings regarding the relationship; and (3) the choice-of-law clause in any such contract. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22–23 (2d Cir. 2004) (citing *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996)). No one factor is

dispositive; ultimately, the determination is based on the totality of the defendant's interactions with, and activities in, New York. *Id.* With respect to the connection between the plaintiff's cause of action and the defendant's business transactions in New York, the statute "does not require a causal link between the defendant's New York business activity and a plaintiff's injury." *Licci*, 732 F.3d at 168. "Instead, it requires a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Id.* at 168–69 (internal quotation marks omitted).

Plaintiff contends that Section 302(a)(1) provides long-arm jurisdiction over defendant for the breach of contract claim. Plaintiff grounds its argument primarily on the allegations that defendant visited plaintiff's offices in New York on several occasions to solicit business from plaintiff, and that Getahoun discussed terms for the 2012 Agreement during his visit to plaintiff's offices in late 2012. (*See* Compl. ¶¶ 8–10.)

In response, defendant has submitted the affidavit of Getahoun, who avers that defendant does not solicit business in New York, that plaintiff was defendant's only New York client, that he traveled to plaintiff's New York offices on only two occasions, and that neither he nor any other representative of defendant ever negotiated the contract at issue while in New York. (*See* Aff. of Alex Getahoun ¶¶ 5–17, May 8, 2014.) Thus, defendant contends that plaintiff has failed to make a *prima facie* showing of personal jurisdiction over defendant under Section 302(a)(1).

As an initial matter, defendant's reliance on Getahoun's affidavit to contradict plaintiff's allegations is misplaced at this

juncture. In *Dorchester*, the Second Circuit reaffirmed the rule that "the showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" 722 F.3d at 84 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Specifically, "'[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction.'" *Id.* (quoting *Ball*, 902 F.2d at 197). "At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations.'" *Id.* at 85 (quoting *Ball*, 902 F.2d at 197). After reciting these basic principles, the *Dorchester* decision then rejected the proposition that a defendant may, on a motion to dismiss under Rule 12(b)(2), refute a plaintiff's unsupported allegations with specific testimonial evidence regarding a fact essential to personal jurisdiction. *Id.* at 86. The Second Circuit held that such a principle would be "inconsistent with the framework set forth in *Ball*." *Id.* at 86. Since then, district courts have rejected attempts by defendants to prevail on a motion to dismiss under Rule 12(b)(3) by offering materials outside the pleadings that contradict plaintiffs' factual allegations concerning personal jurisdiction. *See, e.g.*, *Zelouf Int'l Corp. v. Na El, Inc.*, No. 13-CV-01788 (ALC) (JCF), 2014 WL 1318372, at *2 (S.D.N.Y. Mar. 28, 2014) ("[W]hile the court may consider materials outside the pleadings, it must not make factual determinations where defendant's affidavits and evidence contradict that of the plaintiff."); *AEP-PRI Inc. v. Galtronics Corp. Ltd.*, No. 12-CV-8981 (PAE), 2013 WL 4400833, at *5 (S.D.N.Y. Aug. 13, 2013) (holding that, under *Dorchester*, "the Court must assess whether [the plaintiff] has made a *prima facie* showing of personal

jurisdiction notwithstanding any controverting presentation by [defendants]" (internal citations omitted)); *Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 964 F. Supp. 2d 287, 294 (S.D.N.Y. 2013) (refusing to consider evidence offered by defendant and noting that, under *Dorchester*, a plaintiff may survive a motion to dismiss under Rule 12(b)(2) "by establishing a *prima facie* showing of personal jurisdiction solely by allegations"). Accordingly, although the Getahoun affidavit raises a factual issue concerning defendant's contacts with New York, at this juncture, the Court may only assess whether plaintiff, "through its pleadings and affidavits, made a *prima facie* showing of personal jurisdiction 'notwithstanding any controverting presentation by' [defendant]." *Dorchester*, 722 F.3d at 86 (quoting *Marine Midland Bank*, 664 F.2d at 904).

Applying this standard, the Court concludes that plaintiff's allegations suffice at this stage to make a *prima facie* showing that defendant transacted business in New York. First, plaintiff alleges that defendant maintained an on-going contractual relationship with plaintiff, a company headquartered in New York. *See, e.g.*, *Sunward Elecs.*, 362 F.3d at 22–23. In addition, plaintiff alleges that Getahoun, defendant's president, traveled to plaintiff's New York offices, where he "discussed terms for an agreement that would later become the December 2012 Agreement." (Compl. ¶ 10.) It is well established that contract negotiations satisfy the transacting business element of Section 302(a)(1) so long as the negotiations "substantially advanced," or were "essential to" to the formation of the contract at issue, or if they "advanced the business relationship to a more solid level." *SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 549 (S.D.N.Y. 2003) (internal quotation marks omitted); *see, e.g.*, *Allied*

*Dynamics Corp. v. Kennametal, Inc.*, 965 F. Supp. 2d 276, 292 (E.D.N.Y. 2013); *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1530–31 (S.D.N.Y. 1985); *Goldstein v. CTT Mobile Mgmt. Serv., Inc.*, No. 84-CV-824 (JFK), 1985 WL 321, at *4 (S.D.N.Y. Feb. 26, 1985).[5] Finally, plaintiff allegedly supervised defendant from New York during the course of the agreement, as plaintiff supplied defendant with raw materials and directions. *See, e.g.*, *Sunward Elecs.*, 362 F.3d at 24 (finding relevant to the "transacting business" analysis the fact that the New York "Plaintiff continuously supervised and assisted Defendants during the term of the Dealership Agreement . . . [by] provid[ing] Defendants with training materials and other proprietary information to be used in selling, marketing, installing and maintaining [the] products").

With respect to the "arising under" prong of Section 302(a)(1), the Court concludes that plaintiff has met its burden of showing that its breach of contract claim arose out of defendant's New York business transactions. According to plaintiff's complaint, the breach of contract claim is based upon the breach of an agreement that was negotiated, at least in part, in New York. Thus, the Court concludes that there is a "substantial nexus" between defendant's business transactions in New York and the alleged breach. *See, e.g.*, *Allied Dynamics*, 965 F. Supp. 2d at 294.

### ii. Tort Claims

Section 302(a)(3) provides for long-arm jurisdiction over an out-of-state defendant who committed a tort outside New York, where the tort caused injury within New York. In particular, Section 302(a)(3)(ii) requires proof of the following elements:

> (1) the defendant's tortious act was committed outside New York, (2) the cause of action arose from that act, (3) the tortious act caused an injury to a person or property in New York, (4) the defendant expected or should reasonably have expected that his or her action would have consequences in New York, and (5) the defendant derives substantial revenue from interstate or international commerce.

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (citing *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214 (2000)).[6]

In the instant case, plaintiff maintains that Section 302(a)(3) authorizes the exercise of long-arm jurisdiction over defendant for the negligence, willful misconduct, and gross negligence claims. In response, defendant argues that plaintiff has

---

[5] "Even assuming *arguendo* that the 'meeting in New York was solely for the purpose of conducting a demonstration and no negotiations took place during the meeting,' jurisdiction would be properly asserted here because 'the only conceivable purpose of the demonstration was to foster a more solid relationship, if not a contract, with respect to' plaintiff and [defendant]." *Allied Dynamics*, 965 F. Supp. 2d at 292 n.10 (quoting *SAS Grp.*, 245 F. Supp. 2d at 549).

[6] "The same test applies for assessing jurisdiction under Section 302(a)(3)(i), except that instead of the last two elements, the defendant must: (1) engage in conduct in New York that is regular, persistent, or substantial; or (2) derive substantial revenue from goods sold and consumed in New York or services performed in New York." *Symmetra Pty Ltd. v. Human Facets, LLC*, No. 12-CV-8857 (SAS), 2013 WL 2896876, at *5 (S.D.N.Y. June 13, 2013). In the instant case, plaintiff does not appear to rely on Section 302(a)(3)(i). (*See generally* Pl.'s Opp.)

failed to allege the third element, *i.e.*, injury to a person or property *in New York*.

The Court concludes that plaintiff has failed to make even a *prima facie* showing of injury in New York. "[C]ourts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" *Bank Brussels*, 171 F.3d at 791 (quoting *Hermann v. Sharon Hosp., Inc.*, 522 N.Y.S.2d 581, 583 (N.Y. App. Div. 1987)). "'[I]t has been held that the situs of a nonphysical, commercial injury is where the critical events associated with the dispute took place.'" *Am. Buddha*, 609 F.3d at 38–39 (quoting *Weiss v. Greenburg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, P.A.*, 446 N.Y.S.2d 447, 449 (N.Y. App. Div. 1981)). The "original event" is "generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." *Bank Brussels*, 171 F.3d at 791. Significantly, "[i]t is settled New York law that the suffering of economic damages in New York is insufficient, alone, to establish a 'direct' injury in New York for N.Y. C.P.L.R. § 302(a)(3) purposes." *Am. Buddha*, 609 F.3d at 38; *see, e.g.*, *Fantis Foods, Inc. v. Standard Importing Co., Inc.*, 49 N.Y.2d 317, 326–27 (1980) (holding that Section 302(a)(3) did not confer personal jurisdiction over defendant where "the only possible connection between the claimed conversion and any injury or foreseeable consequence in New York is the fact that [plaintiff] is incorporated and maintains offices there").

In this case, plaintiff's tort claims are premised on the allegations that defendant failed to test plaintiff's raw materials to confirm the certificates of analysis; failed to handle plaintiff's raw materials properly;

failed to prepare proper standard operating procedures, manufacturing protocols, and methods of validation; and attempted to exploit plaintiff's desperate situation by demanding greater payment for the second stability test. (*See* Compl. ¶¶ 109–45.) These events constitute the "original events" for purposes of Section 302(a)(3), and none of these events occurred in New York.[7] *See,*

---

[7] At oral argument, plaintiff's counsel attempted to salvage the willful misconduct claim by arguing that it is based solely on defendant's alleged attempt to exploit plaintiff's desperate situation and force plaintiff to agree to terms favorable to defendant. This act, he contended, had occurred via telephone and e-mail, and had been directed at plaintiff in New York. However, the complaint itself bases the willful misconduct claim on all events leading up to the denial of plaintiff's application for a General Sales License in Australia. In other words, the willful misconduct claim is based not only on defendant's alleged exploitation of plaintiff's desperate situation, but also on the allegations that defendant created that situation. The complaint makes this clear in the allegations under the willful misconduct cause of action. (*See* Compl. ¶ 127 ("As a result of Defendants' failure to test HomeoPet's raw materials to confirm the certificates of analysis, failure to properly handle and ship those raw materials to the Manufacturer and failure to prepare standard operating procedures, manufacturing protocols and methods of validation that would meet GMP standards and comply with FDA and APVMA standards, Defendant placed HomeoPet in a desperate situation where it would need to scramble to make arrangements to have samples produced so that the Second Stability Test could begin on or before May 6, 2013."); ¶ 130 ("Through its own bad actions, Defendant placed itself in a position where HomeoPet had no choice but to use Defendant to perform the Second Stability Test or it would be inevitable that the Application would be rejected."); ¶ 133 ("It is obvious that Defendant sent its April 29 Proposal and subsequently made its May 6 Demand with the intent of leveraging an unfair negotiating position that Defendant received as a result of its own bad actions.").) Accordingly, the Court concludes that, for purposes of the willful misconduct claim, the "original events" causing injury did not occur in New York. The Court also notes that plaintiff's argument regarding the willful misconduct claim, which the Court finds unpersuasive, does not even attempt to

e.g., *Stemcor USA v. Hyundai Merch. Marine Co., Ltd.*, 386 F. Supp. 2d 229, 234 (S.D.N.Y. 2005) (holding that defendant's alleged reckless or negligent failure to deliver cargo constituted the "original event" for claim of mishandling cargo). Moreover, the complaint does not allege that plaintiff lost customers in New York as a result of these original events. *Cf. Ljungkvist v. Rainey Kelly Campbell Roalfe/Young & Rubicam, Ltd.*, No. 01-CV-1681 (HB), 2001 WL 1254839, at *5 (S.D.N.Y. Oct. 19, 2001) ("The loss of potential customers in New York may constitute an injury under section 302(a)(3) only if it is a consequence of the original event that caused the injury." (internal quotation marks omitted)). Based on the complaint, plaintiff lost customers, if any, only in Australia, where plaintiff's application for a General Sales License was denied as a result of defendant's alleged actions. Plaintiff may have suffered damages in New York by virtue of maintaining its business in New York, but that alone is insufficient for a court to exercise personal jurisdiction under Section 302(a)(3). Accordingly, Section 302(a)(3) does not provide a basis for the Court to exercise long-arm jurisdiction over defendant for the negligence, willful misconduct, and gross negligence claims.

\*       \*       \*

In sum, the Court concludes that Section 302 authorizes the exercise of long-arm jurisdiction over defendant for the breach of contract claim, only. With respect to the breach of contract claim, the Court proceeds to analyze whether the exercise of personal jurisdiction over defendant comports with the Due Process Clause of the Fourteenth

Amendment. Because Section 302 does not authorize the exercise of long-arm jurisdiction over defendant for the negligence, willful misconduct, and gross negligence claims, the Court dismisses those claims without prejudice.

b. Due Process

Having concluded that there is an adequate basis for the exercise of specific jurisdiction over defendant for the breach of contract claim, the Court must determine whether the exercise of jurisdiction over defendant comports with the Due Process Clause of the Fourteenth Amendment, which requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being haled into court there."). There are two aspects of the due process analysis: (1) the minimum contacts inquiry, and (2) the reasonableness inquiry. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010).

Although the constitutional due process issue is a separate question, "[o]rdinarily . . . if jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits." *Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88, 90 (S.D.N.Y. 1997). Here, defendant had sufficient minimum contacts with New York that the exercise of personal jurisdiction over him satisfies due process for the same reasons discussed *supra*: plaintiff has alleged that defendant engaged in contract negotiations in New York, and that defendant continued

---

address the negligence claim, which is based entirely on alleged events outside New York.

to maintain a contractual relationship with plaintiff, a New York-based company. If these allegations are proven, it would have been reasonably foreseeable to defendant that it would be subject to suit in New York. *See, e.g.*, *Burger King*, 471 U.S. at 473 ("[W]ith respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." (internal quotation marks omitted)); *Allied Dynamics*, 965 F. Supp. 2d at 296–97 (holding that minimum contacts test was satisfied where defendant negotiated contract in New York and maintained contractual relationship with New York company).

With respect to the reasonableness inquiry, even where an out-of-state defendant is deemed to have purposefully availed himself of the forum state, a plaintiff "must still demonstrate that the exercise of jurisdiction does not 'offend traditional notions of fair play and substantial justice' and is thus reasonable under the Due Process Clause." *Chloe*, 616 F.3d at 172–73 (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987)). As set forth by the Supreme Court, courts should consider five factors when determining the reasonableness of a particular exercise of jurisdiction:

> A court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It also must weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of

controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.

*Asahi*, 480 U.S. at 113 (citation and internal quotation marks omitted). "Where the other elements for jurisdiction have been met, dismissals on reasonableness grounds should be 'few and far between.'" *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 246 (S.D.N.Y. 2010) (quoting *Robertson-Ceco*, 84 F.3d at 575).

Although there may be some burden on defendant in defending itself in New York, its choice to conduct business with a New York-based company in the past suggests that it is not an unreasonable burden. *See, e.g.*, *Huang*, 2014 WL 1377500, at *5 ("Although there may be some burden on Lin in defending himself in New York, his choice to conduct business there suggests that it is not an unreasonable burden."). In addition, "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129–30 (2d Cir. 2002) (internal quotation marks and citation omitted). The second factor favors keeping New York as the forum state, since "a state frequently has a manifest interest in providing effective means of redress for its residents," *Chloe*, 616 F.3d at 173 (internal quotation marks and citation omitted), as does the third factor, since plaintiff is located here. The fourth and fifth factors appear to be neutral in this case.

Accordingly, the Court concludes that this is not one of the few and far between cases in which the exercise of jurisdiction would be unreasonable despite the fact that plaintiff has satisfied the state long arm

statute and minimum contacts analyses. In short, the exercise of personal jurisdiction over defendant "comports with traditional notions of fair play and substantial justice, such that it satisfies the reasonableness inquiry of the Due Process Clause." *Id.* (citation and internal quotation marks omitted).

## B. Venue

To survive a motion to dismiss brought under Rule 12(b)(3), the plaintiff has the burden of pleading proper venue. *See, e.g.*, *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 447 (E.D.N.Y. 2013); *Cold Spring Harbor Lab. v. Ropes & Gray LLP*, 762 F. Supp. 2d 543, 551 (E.D.N.Y. 2011). As is the case on a Rule 12(b)(2) motion, however, the plaintiff need only make a *prima facie* showing of venue if the court relies only on pleadings and affidavits. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). "Thus, if an evidentiary hearing on the question of venue has not been held, 'the Court accepts facts alleged in the complaint as true and draws all reasonable inferences in [plaintiff's] favor.'" *Zaltz*, 952 F. Supp. 2d at 447 (quoting *Person v. Google Inc.*, 456 F. Supp. 2d 488, 493 (S.D.N.Y. 2006)) (brackets in original). However, the Court may consider facts outside of the pleadings on a Rule 12(b)(3) motion. *See, e.g.*, *id.*; *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 375 n.3 (S.D.N.Y. 2010) (explaining that, in deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3), "a court may consider evidentiary matters outside the pleadings, by affidavit or otherwise, regarding the existence of jurisdiction" (citation and internal quotation marks omitted)), *aff'd*, 647 F.3d 472 (2d Cir. 2011) and 435 F. App'x 31 (2d Cir. 2011).

If there are disputed facts relevant to the venue determination, it may be appropriate for the district court to hold an evidentiary hearing, where the plaintiff must demonstrate venue by a preponderance of the evidence, before resolving the Rule 12(b)(3) motion. *See New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997) ("A disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing. . . . [N]o disputed fact should be resolved against [the non-moving] party until it has had an opportunity to be heard." (citations omitted)); *see also Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139 (9th Cir. 2004) ("To resolve such motions when genuine factual issues are raised, it may be appropriate for the district court to hold a Rule 12(b)(3) motion in abeyance until the district court holds an evidentiary hearing on the disputed facts. Whether to hold a hearing on disputed facts and the scope and method of the hearing is within the sound discretion of the district court." (citations omitted)).

In the instant case, defendant contends that venue is improper under 28 U.S.C. § 1391, which "govern[s] the venue of all civil actions brought in district courts of the United States." 28 U.S.C. § 1391(a)(1). The instant case was not *brought* in a United States District Court, however; plaintiff brought the case in state court, and defendant removed the case to this Court under 28 U.S.C. § 1441. The difference is significant because, as the Second Circuit has held, "[t]he removal statute, and not the ordinary federal venue statute, 28 U.S.C. § 1391, governs venue in removed cases." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 72 (2d Cir. 1998) (citing *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665–66 (1953)); *see, e.g.*, *Excellent Home Care Servs., LLC v. FGA, Inc.*, No. 13-CV-05390 (ILG), 2014 WL 652357, at *2 (E.D.N.Y. Feb. 19, 2014)

14

("[B]ecause this case was removed from state court, venue is determined by 28 U.S.C. § 1441(a), which governs removal of actions brought in state courts, instead of § 1391, which governs venue in actions brought in federal courts."); *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 235 (S.D.N.Y. 2013) (same). Section 1441(a) states that a defendant may remove a case brought in state court "to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Here, plaintiff brought this case in state court in Suffolk County, New York. Removal to the Eastern District of New York was therefore proper under § 1441(a).

Even assuming *arguendo* that § 1391 applied, venue in this district would be proper. Under 28 U.S.C. § 1391(b), a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

A corporate defendant resides "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). Furthermore, "in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts." *Id.* § 1391(d).

In the instant case, because plaintiff has made a *prima facie* showing of personal jurisdiction over defendant (at least for the breach of contract claim), it follows that plaintiff has made a *prima facie* showing that defendant resides in New York for venue purposes. 28 U.S.C. § 1391(c)(2). More specifically, if the allegations in the complaint were true, defendant would reside in the Eastern District of New York for venue purposes because all of defendant's relevant contacts with New York occurred in this judicial district. *Id.* § 1391(d). Accordingly, plaintiff has made a *prima facie* showing that venue is proper in this district under § 1391(b)(1). *See, e.g.*, *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, No. 09-CV-1340 (SLT) (JO), 2013 WL 4048324, at *4 (E.D.N.Y. Aug. 9, 2013) ("The Court therefore finds that venue is proper in the Southern District under § 1391(b)(1) and (c)(2) because all Defendants reside in New York and MR & A, as a corporate entity, is subject to that court's personal jurisdiction."); *Bank of Am., N.A. v. Wilmington Trust FSB*, 943 F. Supp. 2d 417, 423 (S.D.N.Y. 2013) ("[B]ecause all defendants are subject to personal

jurisdiction in New York, Section 1391(b)(1) is satisfied."); *Weisman Celler Spett & Modlin, P.C. v. Trans-Lux Corp.*, No. 12-CV-5141 (JMF), 2012 WL 5512164, at *3 (S.D.N.Y. Nov. 14, 2012) ("As there is personal jurisdiction over Defendant, venue is plainly proper in this district."); *Mrs. U.S. Nat'l Pageant, Inc. v. Miss U.S. Org., LLC*, 875 F. Supp. 2d 211, 226 n.7 (W.D.N.Y. 2012) ("Based on my findings as to personal jurisdiction, then, I also conclude that venue is proper in this district.").

The Court thus denies defendant's motion to dismiss for improper venue. Venue over the breach of contract claim is proper in this district, and defendant's motion with respect to plaintiff's other claims is moot.[8]

                    *        *        *

In sum, the Court grants defendant's motion to dismiss the negligence, willful misconduct, and gross negligence claims for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), and those claims are dismissed without prejudice. The Court denies defendant's motion to dismiss the breach of contract action pursuant to either Rule 12(b)(2) or Rule 12(b)(3).

### III. MOTION TO TRANSFER

#### A. Legal Standard

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district

---

[8] Because the Court denies defendant's motion to dismiss for improper venue on the merits, the Court need not consider whether defendant waived its right to raise the issue.

or division where it might have been brought." Section 1404(a) is intended "to prevent waste of 'time, energy and money' and 'to protect litigants, witnesses and [the] public against unnecessary inconvenience and expense.'" *Mastercard Int'l Inc. v. Lexcel Solutions, Inc.*, No. 03-CV-7157 (WHP), 2004 WL 1368299, at *5 (S.D.N.Y. June 16, 2004) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964)). "District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair*, 462 F.3d at 106; *accord Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 117 (2d Cir. 1992). In determining whether to transfer venue, courts consider (1) whether the action could have been brought in the proposed forum; and (2) whether the transfer would "promote the convenience of parties and witnesses and would be in the interests of justice." *Clarendon Nat'l Ins. Co. v. Pascual*, No. 99-CV-10840 (JGK) (AJP), 2000 WL 270862, at *2 (S.D.N.Y. Mar. 13, 2000) (quoting *Coker v. Bank of Am.*, 984 F. Supp. 757, 764 (S.D.N.Y. 1997) (other citations omitted)).

The parties do not dispute that this action could have been brought in the Northern District of Georgia. (*See* Pl.'s Opp. at 17 ("HomeoPet does not dispute that it could have filed its Complaint against the Defendant in the Northern District of Georgia.").) Instead, the parties focus on whether transfer would promote the interests of justice and the convenience of the parties. The Second Circuit has summarized some of the factors, among others, that a district court is to consider in the exercise of its discretion:

> (1) the plaintiff's choice of forum, (2) the convenience of the witnesses, (3) the location

of relevant documents and relative ease of access to sources of proof, (4) the convenience of the parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties.

*D.H. Blair*, 462 F.3d at 106–07 (quoting *Albert Fadem Trust v. Duke Energy Corp.*, 214 F. Supp. 2d 341, 343 (S.D.N.Y. 2002)) (brackets in original). Some courts have identified additional factors, such as "trial efficiency and the interest of justice, based on the totality of the circumstances." *Glass v. S & M NuTec*, 456 F. Supp. 2d 498, 501 (S.D.N.Y. 2006); *see, e.g.*, *In re Hanger Orthopedic Grp., Inc. Sec. Litig.*, 418 F. Supp. 2d 164, 167–68 (E.D.N.Y. 2006); *Dealtime.com v. McNulty*, 123 F. Supp. 2d 750, 755 (S.D.N.Y. 2000).

In the instant case, the first-filed rule is an additional factor to consider in weighing the interests of justice and the convenience of the parties. Under the first-filed rule, "'[w]here there are two competing lawsuits, the first suit should have priority.'" *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting *D.H. Blair*, 462 F.3d at 106); *see, e.g.*, *Employers Ins. of Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271, 274–75 (2d Cir. 2008). However, "[t]he rule is inapplicable when there are 'special circumstances,'" or "when the 'balance of convenience favors the second-filed action.'" *Lafarge*, 599 F.3d at 112 (quoting *Fox*, 522 F.3d at 275). A court examines "the same factors 'considered in connection with motions to transfer venue'" in determining whether departure from the first-filed rule is warranted. *Id.* (quoting *Fox*, 522 F.3d at 275). In other words, on a

motion to transfer venue, "the first-filed rule does not supersede the inquiry into the balance of convenience under § 1404(a)." *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 481 (S.D.N.Y. 2007), *aff'd sub nom. N.Y. Marine & Gen. Ins., Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010); *see, e.g.*, *Tomjai Enters., Corp. v. Laboratorie Pharmaplus USA, Inc.*, No. 12-CV-3729 (RWS), 2012 WL 3104891, at *7 (S.D.N.Y. July 31, 2012); *Blechman v. Ideal Health, Inc.*, 668 F. Supp. 2d 399, 404 (E.D.N.Y. 2009). Instead, a court considers the first-filed rule "as one among several factors in the overall calculus of efficiency and the interests of justice." *Lafarge*, 474 F. Supp. 2d at 481.

There is no strict formula for the application of these factors, and no single factor is determinative. *See, e.g.*, *Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 402 (S.D.N.Y. 2005); *Aktiengesellschaft v. Milwaukee Elec. Tool Corp.*, No. 04-CV-629 (ARR) (ASC), 2004 WL 1812821, at *4 (E.D.N.Y. July 19, 2004). Instead, these factors should be applied and weighed in the context of the individualized circumstances of the particular case. The moving party, Speed, bears the burden of showing that transfer is warranted in light of these factors. *See, e.g.*, *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 348 (E.D.N.Y. 2012); *O'Hopp v. ContiFinancial Corp.*, 88 F. Supp. 2d 31, 34 (E.D.N.Y. 2000) (citing *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978)).

## B. Application

### 1. First-Filed Rule

The parties do not dispute that this action and the Georgia Action involve the same parties and issues. Moreover, it is

uncontested that HomeoPet filed this action six days before Speed filed the Georgia Action. Accordingly, this action is the first-filed action.[9]

Speed urges the Court to depart from the first-filed rule in this case on the basis of "special circumstances"—specifically, that HomeoPet induced Speed to delay the filing of the Georgia Action during settlement negotiations. Courts have recognized that the first-filed rule should not apply where the party to benefit from the first-filed rule induced the other party to delay filing a similar action in a different district. *See, e.g.*, *Revise Clothing, Inc. v. Levi Strauss & Co.*, No. 10-CV-5843 (DAB), 2010 WL 4964099, at *3 (S.D.N.Y. Dec. 6, 2010); *Maximum Human Performance, Inc. v. Dymatize Enters., Inc.*, No. CIV.A. 09-235 (PGS), 2009 WL 2778104, at *4–5 (D.N.J. Aug. 27, 2009), *report & recommendation adopted*, 2009 WL 2952034 (D.N.J. Sept. 14, 2009); *Innovation Ventures, L.L.C. v. Custom Nutrition Labs., L.L.C.*, 534 F. Supp. 2d 754, 756 (E.D. Mich. 2008). The policy behind this exception to the first-filed rule is to promote amicable settlements and discourage gamesmanship.

> Where a party is prepared to pursue a lawsuit, but first desires to attempt settlement discussions, that party should not be deprived of the first-filed rule's benefit simply because its adversary used the resulting delay in filing to proceed with the mirror image of the anticipated suit. Otherwise, potential plaintiffs would be discouraged from first attempting to resolve their claims without resorting to litigation.

*Revise Clothing*, 2010 WL 4964099, at *3 (quoting *Elbex Video Ltd. v. Tecton, Ltd.*, No. 00-CV-673 (LMM), 2000 WL 1708189 (S.D.N.Y. 2000) (quoting *Ontel Prods., Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144, 1150 (S.D.N.Y. 1995))).

In the instant case, Speed claims that HomeoPet improperly induced Speed to delay filing the Georgia Action while settlement negotiations remained ongoing. However, the only evidence Speed has submitted—a series of e-mails between Speed's counsel and HomeoPet's counsel—does not support this claim. Specifically, Speed contends that HomeoPet's counsel urged Speed's counsel to delay filing suit in favor of settlement negotiations. The text of that e-mail suggests no such thing. HomeoPet's counsel stated that he believed filing suit would be a "poor choice" because settlement could be more fruitful, but he also indicated that Speed "has its rights in litigation." (Def.'s Mot. Ex. 1, E-mail from Alan S. Hock to Dodie Rosenberger, Aug. 30, 2013.) Moreover, it appears from subsequent e-mails that the parties did, in fact, engage in settlement negotiations until HomeoPet commenced this action for reasons unexplained by the record. Accordingly, Speed has not carried its burden to show "special circumstances" warranting departure from the first-filed rule.

---

[9] Defendant notes that the complaint in the Georgia Action was served on HomeoPet before the complaint in this action was served on Speed. The date the complaint was served upon the opposing party, however, does not determine the first-filed action, at least in a case "where there was clear notice of the first-filed suit." *Amperion, Inc. v. Current Grp., LLC*, No. 10-CV-5362 (NRB), 2010 WL 3469307, at *1 (S.D.N.Y. Aug. 23, 2010); *see, e.g.*, *Schnabel v. Ramsey Quantitative Sys., Inc.*, 322 F. Supp. 2d 505, 511 n.4 (S.D.N.Y. 2004) ("The relative dates of service of the complaints are irrelevant to the inquiry of which action was first filed." (citing cases)).

The first-filed rule thus favors adjudication of the present dispute in this Court. However, the first-filed rule carries comparatively less weight in this case than in others because this action and the Georgia Action were "filed in quick succession." *Lafarge*, 474 F. Supp. 2d at 489; *see Raytheon Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 306 F. Supp. 2d 346, 352 (S.D.N.Y. 2004) ("[W]here the two actions were filed within a short span of time, the court may afford a diminished degree of deference to the forum of the first filing."). Moreover, for the reasons discussed *infra*, the balance of convenience factors favor the transfer of this action to the Northern District of Georgia.

### 2. Forum Selection Clause

The presence of a forum selection clause is only one factor—"albeit a significant one"—in the transfer analysis under § 1404(a). *See Zaltz*, 952 F. Supp. at 456–57 (citing cases). Here, defendant argues that the parties agreed to litigate disputes in Georgia as part of their prior course of dealings. In support of this argument, defendant points only to a 2011 agreement between plaintiff and defendant—an agreement to perform an accelerated stability test on products unrelated to this case—which contains a forum selection clause identifying Gwinnett County, Georgia as the exclusive venue for all disputes arising out of that agreement. (*See* Def.'s Mot. Ex. 2.) Defendants state correctly that a forum selection clause may become binding on parties to a contract through their prior course of dealings. *New Moon Shipping*, 121 F.3d at 31 (holding that "terms repeated in a number of written confirmations," such as a forum selection clause, "may, over time, become part of later contracts"). However, defendant cites to no authority, and this Court has found none, establishing that the presence of a forum

selection clause in one prior contract automatically becomes part of all future contracts between the parties as a prior course of dealing. *Cf. K.K.D. Imports, Inc. v. Karl Heinz Dietrich GmbH & Co. Int'l Spedition*, 36 F. Supp. 2d 200, 203 (S.D.N.Y. 1999) (holding that plaintiff was bound by forum selection clause, where a forum selection clause had appeared in forty-one prior shipment invoices between plaintiff and defendant, thus establishing a binding course of dealing between the parties). Moreover, fact finding would be necessary before the Court could find a prior course of dealings. *Cf. New Moon Shipping*, 121 F.3d at 31 (holding that the existence of a prior course of dealings is a question of fact). Nevertheless, such fact finding is unnecessary in this case because the Court concludes, for the reasons discussed *infra*, that this action should be transferred to the Northern District of Georgia even assuming the forum selection clause carries no weight.

### 3. Plaintiff's Choice of Forum

It is well settled that the plaintiff's choice of forum is "given great weight." *D.H. Blair*, 462 F.3d at 107. Thus, "[a] plaintiff's choice of venue is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer." *Royal Ins. Co. of Am. v. United States*, 998 F. Supp. 351, 353 (S.D.N.Y. 1998). However, courts have noted that the weight given to this factor is diminished where the operative facts have "little or no connection" with the forum chosen by the plaintiff. *Stein v. Microelectronic Packaging, Inc.*, No. 98-CV-8952 (MBM), 1999 WL 540443, at *8 (S.D.N.Y. July 26, 1999); *see, e.g., Wagner v. N.Y. Marriott Marquis*, 502 F. Supp. 2d 312, 317 (N.D.N.Y. 2007) ("The presumption favoring plaintiff's choice of forum, however, is not so rigidly applied where, as here, the cause of action arose

outside of that forum . . . ."); *Royal Ins. Co. of Am.*, 998 F. Supp. at 353 ("The weight accorded to a plaintiff's choice of venue is significantly diminished, however where the operative facts have no connection to the chosen district."); *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 96 (S.D.N.Y. 1995) ("The deference accorded to plaintiff's choice of forum . . . is diminished substantially where the forum is neither plaintiff's home district nor the place where the events or transactions underlying the action occurred."); *Thomas Am. Corp. v. Fitzgerald*, No. 94-CV-0262 (CBM), 1994 WL 440935, at *5 (S.D.N.Y. Aug. 11, 1994) (same); *Hernandez v. Graebel Van Lines, Inc.*, 761 F. Supp. 983, 990 (E.D.N.Y. 1991) ("[W]here the transactions or facts giving rise to the action have no material relation or significant connection to the plaintiff's chosen forum, then the plaintiff's choice is not accorded the same 'great weight' and in fact is given reduced significance."). "Moreover, where it appears that the plaintiff was forum shopping and that the selected forum has little or no connection with the parties or the subject matter, plaintiff's choice of forum is entitled to no weight whatever, and transfer of venue is appropriate." *Pierce v. Coughlin*, 806 F. Supp. 426, 429 (S.D.N.Y. 1992) (internal quotation marks and citation omitted).

Defendant does not contest this factor, and the Court concludes that plaintiff's choice of forum is entitled to great weight here. Plaintiff is headquartered in this district, at least some of the operative facts giving rise to this suit occurred in this district, and there is no evidence of forum shopping.

### 4. Convenience of Witnesses

In deciding whether to disturb the plaintiff's choice of forum, the convenience of the witnesses is generally the most important factor in the transfer analysis. *See, e.g.*, *DLJ Mortg. Capital, Inc. v. Cameron Fin. Grp., Inc.*, No. 07-CV-3746 (LAP), 2007 WL 4325893, at *5 (S.D.N.Y. Dec. 4, 2007) (noting that "the convenience of witnesses is typically the most important factor in a motion pursuant to § 1404(a)"); *accord Wagner*, 502 F. Supp. 2d at 315 ("[T]he convenience of both party and non-party witnesses is probably the single-most important factor in the analysis of whether transfer should be granted." (internal quotation marks and citation omitted)); *Neil Bros. Ltd. v. World Wide Lines, Inc.*, 425 F. Supp. 2d 325, 329 (E.D.N.Y. 2006) ("The convenience of the witnesses is probably the single most important factor in the transfer analysis."); *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.*, 774 F. Supp. 858, 868 (S.D.N.Y. 1991) ("The core determination under § 1404(a) is the center of gravity of the litigation, a key test of which is the convenience of witnesses. Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district." (citations omitted)).

"Generally, the moving party submits an affidavit explaining why the transferee forum is more convenient, which includes 'the potential principal witnesses expected to be called and the substance of their testimony.'" *EasyWeb Innovations*, 888 F. Supp. 2d at 350 (quoting *Pall Corp. v. PTI Techs., Inc.*, 992 F. Supp. 196, 198 (E.D.N.Y. 1998)). Defendant has not done so here. However, plaintiff has submitted the initial disclosure statements of the parties, which list a total of fourteen potential witnesses. (*See* Turman Decl., Apr. 28, 2014, Exs. 7–8, Initial Disclosure Statements.) Two are located in Georgia, and three are located in Westhampton, New York; the remaining witnesses are located in New Jersey, West Virginia, Texas, Australia, Ireland, and Scotland. From this

list alone, it does not appear that the convenience of witnesses favors the Northern District of Georgia. However, because the Court cannot determine from this list how many witnesses each side intends to call, or the materiality of each witness's testimony, this factor is ultimately neutral. *See, e.g.*, *EasyWeb Innovations*, 888 F. Supp. 2d at 352. Such "[v]ague generalizations and failure to clearly specify the key witnesses to be called, along with a statement concerning the nature of their testimony, are an insufficient basis upon which to grant a change of venue under § 1404(a)." *Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, 6 F. Supp. 2d 203, 208–09 (S.D.N.Y. 1998).

## 5. Location of Documents

With respect to the location of documents, defendant argues that "all of the records and documents relating to the contract and the work to be performed are maintained in Georgia." (Def.'s Mem. 12.) "However, the Court does not view this factor as particularly significant given the technological age in which we live, with the widespread use of, among other things, electronic document production." *EasyWeb Innovations*, 888 F. Supp. 2d at 352; *see, e.g.*, *Lafarge*, 474 F. Supp. 2d at 484 ("The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents."); *Distefano v. Carozzi N. Am., Inc.*, No. 98-CV-7137 (SJ), 2002 WL 31640476, at *4 (E.D.N.Y. Nov. 16, 2002) ("Although the location of relevant documents is entitled to some weight when determining whether a case should be transferred, modern photocopying technology deprives this issue of practical or legal weight." (citations omitted)).

## 6. Convenience of the Parties

In terms of the convenience of the parties, the Court recognizes that "'[w]here transfer would merely shift the inconvenience from one party to the other,' the Court should leave plaintiff's choice of venue undisturbed." *Wagner*, 502 F. Supp. 2d at 316 (quoting *Wilshire Credit Corp. v. Barrett Capital Mgmt. Corp.*, 976 F. Supp. 174, 182 (W.D.N.Y. 1997)); *accord Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 725 F. Supp. 1314, 1322 (S.D.N.Y. 1989). However, "transfer of venue may be appropriate where inconvenience for the party moving for transfer could be completely eliminated without substantially adding to the non-moving party's inconvenience." *Frame v. Whole Foods Mkt., Inc.*, No. 06-CV-7058 (DAB), 2007 WL 2815613, at *6 (S.D.N.Y. Sept. 24, 2007).

Here, transferring venue to the Northern District of Georgia would not simply shift the inconvenience from defendant to plaintiff. As discussed in greater detail *infra*, plaintiff can only litigate its tort claims in the Georgia Action. As plaintiff's counsel conceded at oral argument, it would be highly inconvenient to both parties to litigate different claims concerning the same underlying dispute in two different fora. Thus, the convenience of the parties favors transfer to the Northern District of Georgia.

## 7. Locus of Operative Facts

"The location of the operative facts is traditionally an important factor to be considered in deciding where a case should be tried." *800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 134 (S.D.N.Y. 1994). To ascertain the locus of operative facts, "courts look to 'the site of the events from which the claim arises.'" *Mohsen v. Morgan Stanley & Co.*

*Inc.*, No. 11-CV-6751 (PGG), 2013 WL 5312525, at *6 (S.D.N.Y. Sept. 23, 2013) (quoting *Age Grp. Ltd. v. Regal Logistics, Corp.*, No. 06-CV-4328 (PKL), 2007 WL 2274024, at *3 (S.D.N.Y. Aug. 8, 2007)).

This factor tips in favor of transfer here. Specifically, "[i]n a contract case, the locus of operative facts is determined by the location where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred." *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 745 (S.D.N.Y. 2013). Here, although at least some negotiations occurred in New York, *see supra*, the contract—*i.e.*, testing and confirming the certificates of analysis, drafting new standard operating procedures, conducting stability tests, and performing other services to bring plaintiff into regulatory compliance—was to be performed in Georgia, where defendant is based. Moreover, plaintiff attributes defendant's alleged breach of the 2012 Agreement to defendant's actions taken in Georgia. Thus, as between New York and Georgia, the locus of operative facts occurred in Georgia. *See, e.g.*, *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 842 (S.D.N.Y. 2012) (holding that the locus of operative facts "appears to be California" where the breach was "carried out" in California by Facebook employees); *JDA eHealth Sys. Inc., v. Chapin Revenue Cycle Mgmt., LLC*, No. 10 C 7781, 2011 WL 2518938, at *9 (N .D. Ill. June 23, 2011) ("[T]he situs of material events in a breach of contract case is where the business decisions causing the breach occurred." (citations and internal quotation marks omitted)). Finally, although plaintiff retained defendant's services from New York, that fact is not especially relevant in determining the locus of operative facts. *See, e.g.*, *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12-CV-4263 (JFB) (AKT), 2013 WL

5328324, at *13 (E.D.N.Y. Sept. 23, 2013) (holding that it was irrelevant to transfer analysis that plaintiff "retained defendant's services from New York"); *Berger v. Cushman & Wakefield of Pa., Inc.*, No. 12-CV-9224 (JPO), 2013 WL 4565256, at *10 (S.D.N.Y. Aug. 28, 2013) (rejecting plaintiffs' argument that locus of operative facts was New York because plaintiffs' "injuries have a direct connection to New York," and holding that locus of operative facts was where fraud was planned and executed); *Fteja*, 841 F. Supp. 2d at 842 (holding that "courts addressing motions to transfer cases sounding in contract have not considered" the location of the alleged harm).

### 8. Availability of Process

Rule 45 of the Federal Rules of Civil Procedure prohibits a subpoena from directing a witness to travel more than 100 miles. *See* Fed. R. Civ. P. 45. There is no indication that any non-party witnesses would refuse to appear and, thus, this factor is neutral.

### 9. Relative Means of the Parties

"Where a disparity exists between the means of the parties, such as in the case of an individual suing a large corporation, the court may consider the relative means of the parties in determining where a case should proceed." *800-Flowers*, 860 F. Supp. at 135; *see also Dwyer v. Gen. Motors Corp.*, 853 F. Supp. 690, 693–94 (S.D.N.Y. 1994) (denying transfer where "[p]laintiffs are individuals who are suing a large corporation which possesses considerably greater financial assets"). In this case, neither party argues for this factor, and the Court determines it be neutral.

10. Trial Efficiency and Interests of Justice

Finally, the Court considers whether the interests of justice and efficiency favor transfer of this case to the Northern District of Georgia. In particular, the Court examines this factor in light of the Court's decision to dismiss plaintiff's tort claims for lack of personal jurisdiction. Given the Court's holding on personal jurisdiction, plaintiff intends to bring its tort claims in the Georgia Action. Although plaintiff has not yet asserted those claims as counterclaims in the Georgia Action, its answer in that action reserved the right to do so if necessary. (*See* Answer, *Speed Lab., Inc. v. HomeoPet, LLC*, No. 14-CV-324-CC (N.D. Ga. Feb. 11, 2014).) Moreover, at oral argument on the pending motion, plaintiff confirmed its intention to bring its tort claims in the Georgia Action, if those claims were dismissed in this action. In other words, unless the Court transfers this action to the Northern District of Georgia, plaintiff will be pursuing its breach of contract claim in this Court and its tort claims in Georgia. Other courts confronted with similar threats of piecemeal litigation have decided that a transfer is warranted to the district capable of hearing all of the parties' claims. *See Kreisner v. Hilton Hotel Corp.*, 468 F. Supp. 176, 179 (E.D.N.Y. 1979) ("[T]he consideration of paramount importance in our determination is the probability that a decision to permit litigation to proceed in this district will result in duplicative and piecemeal litigation of the merits of this action. . . . Since all the parties may be joined in one action in the Northern District of Texas and all the claims and defenses may be raised and decided by the same court, the interests of justice are best served by transfer to that forum."); *accord Accelinear Serv. Co., Ltd. v. Varian Assocs., Inc.*, No. 96-CV-01275 (WWE), 1996 WL 776580, at *4 (D. Conn. Oct. 15, 1996) ("Transferring this case will avoid duplicative and piecemeal litigation, a factor to which this court gives great weight."); *Blue Compass Corp. v. Polish Masters of Am.*, 777 F. Supp. 4, 5–6 (D. Vt. 1991) ("[B]ecause the federal claim cannot be litigated in this district, it makes little sense to litigate the ancillary state claim here in piecemeal fashion. Therefore, pursuant to 28 U.S.C. § 1404(a) . . . the state as well as the federal claim is transferred to the Central District of California."). In fact, at oral argument, plaintiff's counsel agreed that it did not make sense to have cases pending in two courts. Given that the tort claims cannot be brought here, the need to avoid piecemeal litigation is a compelling factor that outweighs all other factors that favor retaining this case in this district.

\*     \*     \*

The Court concludes that the compelling interest in avoiding piecemeal litigation and the locus of operative facts warrant transfer of this action to the Northern District of Georgia. In this Court's judgment, those factors outweigh the other factors— including the fact that this action is the first-filed—that tip in favor of retaining this case. Accordingly, defendant has met its burden of demonstrating that transfer is warranted, and the Court grants defendant's motion to transfer this action to the Northern District of Georgia.

## IV. CONCLUSION

For the reasons set forth herein, the Court grants defendant's motion to dismiss the negligence, willful misconduct, and gross negligence claims for lack of personal jurisdiction. The Court denies defendant's motion to dismiss the breach of contract claim, because plaintiff has made a *prima facie* showing of personal jurisdiction over defendant for the breach of contract claim, and venue is proper in this district. However, the Court grants defendant's motion to transfer this case to the United States District Court for the Northern District of Georgia under 28 U.S.C. § 1404(a).

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: June 11, 2014
       Central Islip, NY

*       *       *

Plaintiff is represented by Stephen Eric Turman and Robert Michael Tils of Moritt Hock Homroff & Horowitz, 400 Garden City Plaza, Suite 202, Garden City, NY 11530. Defendant is represented by William Roche Bronner of William R. Bronner Attorney at Law, 294 Vanderbilt Avenue, Brooklyn, NY 11205; Dorothy Rosenberger of O'Kelley & Sorohan, Attorneys at Law, LLC, 2170 Satellite Boulevard, Suite 375, Deluth, GA 30097; and Robert Wildstein of Bodker Ramsey Andrews Winograd & Wildstein, P.C., One Securities Centre, 3490 Piedmont Road, Suite 1400, Atlanta, GA 30305.